Christian Levis (admitted pro hac vice)
Amanda Fiorilla (admitted pro hac vice)
Rachel Kesten (admitted pro hac vice)
Yuanchen Lu (admitted pro hac vice)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com
rkesten@lowey.com
ylu@lowey.com

Gary M. Klinger (admitted pro hac vice)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
gklinger@milberg.com

Daniel R. Schwartz (pro hac vice)
Rebecca Trickey (pro hac vice)
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: (312) 214-7900
dschwartz@dicellolevitt.com
rtrickey@dicellolevitt.com

*Attorneys for the Plaintiffs and the Proposed Class*

*[additional counsel listed below]*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| IN RE ADOBE DATA TRACKING LITIGATION | Case No. 5:25-cv-03032-NW<br><br>CONSOLIDATED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL |

Plaintiffs Nicholas Rapak, Bianca Johnston, Minchul Paul Chwe, and Dana Olita ("Plaintiffs"), individually and on behalf of all other similarly situated individuals, assert the following against Defendant Adobe Inc. ("Adobe" or "Defendant") based upon personal knowledge, information and belief (where applicable), and the investigation of counsel.

## I. NATURE OF THE CASE

1. This case concerns the worst kind of surveillance capitalism. Leveraging a series of software products marketed for supposedly innocuous purposes, like improving customers' experience on web properties, Adobe created a vast system that tracks and profiles individuals based on their private web activity across the Internet, and inside mobile apps. Indeed, Plaintiffs have identified Adobe's tracking technology deployed across thousands of websites, including more than 23% of the top 10,000. Given the frequency individuals interact with these sites—which include everything from financial institutions, to travel services, video service providers, and even healthcare providers—Adobe likely has profiles on all (if not nearly) all Americans on the Internet.

2. The motive behind Adobe's surveillance network is simple: to amass data that it can use to sell targeted ads. Far from its roots as developer of the PDF, Adobe is now deeply entrenched in the digital advertising ecosystem as one of several Demand Side Platforms (or "DSPs") that handle bids for targeted adds in apps and websites. The anchor for these bids, and in fact Adobe's entire advertising business, is its "identity graph"—i.e., the collection of profiles complied about individuals that aggregates personally identifiable information ("PII") against unique identifiers that Adobe ties to a specific individual.

3. The touchstone of Adobe's identity graph is a proprietary identifier called the Experience Cloud Identifier or "ECID." Adobe creates and assigns and ECID to each individual that comes in to contact with its tracking technology. As users visit web properties, whether on their browser or through apps, Adobe looks up the user to find the corresponding ECID and then records their communications with those services so that it can aggregate them back to same identity profile, using the same ECID it assigned them in the first instance.

4. Adobe's use of ECID in lieu of other, potentially mutable identifiers like a device-specific identifiers, is specifically designed to subvert modern privacy protections. For instance, while Apple and Google have made it possible in recent years for users to theoretically reset the "Advertising Identifiers" associated with their mobile devices to minimize targeted advertising,

these device-specific setting would have no impact on Adobe's ECID, which remains assigned to the same user across devices, and can still be looked up based on other information.

5. Adobe's technology is also designed to circumvent browser-based tracking protections. Many modern browsers, like Apple's Safari, sought to prevent online tracking by blocking "third party cookies." While "cookies"—i.e., small text files placed by a web server on a computer or mobile device—are commonly used by website operators, third party cookies, which are placed by someone *other than* the website operator exist almost exclusively for tracking. As a workaround to these tracking protections, Adobe developed a sophisticated scheme to conceal the origin of its cookies so that they appear as though they originated from the website operator and are therefore not blocked by browsers.

6. These cookies are a key component to Adobe's tracking and profiling scheme. Using a process called "cookie syncing" Adobe greatly augments its ability to identify and profile individuals by sharing information about the individuals it profiles with "partners"—e.g., other ad exchanges, DSPs, Supply Side Platforms ("SSPs"), or identity service provides—involved with digital advertising, who do the same in return. This is observable using Adobe's "demdex" cookie. After being deposited on individuals' machines as a fake first party cookie using the masking process described above, Adobe performs ID synchronization calls with partner exchanges to map its ECID against the identifiers used by each corresponding exchange. As a result, Adobe's identity profile that incorporates multiple identifiers that allow it to identify specific individuals across devices and platforms so that it can target them with ads.

7. This directly impacts Plaintiffs. Over the past several years, Plaintiffs have visited popular websites and communicated sensitive information with no inkling that Adobe was watching, tracking and collecting their data across websites and mobile applications, and creating highly detailed profiles containing their most sensitive information. As detailed in the "Plaintiffs' Experiences" section below and in **Exhibit A** (the Declaration of Computer Expert Richard M. Smith dated October 22, 2025), Plaintiffs visited websites that incorporate Adobe's tracking technology and as a result, recorded their sensitive communications for profiling and targeted

advertising. Shockingly, visits to these websites *after* the filing of the initial complaints in this action confirm that Adobe continues to deploy the same tracking and profiling strategies today.

8. Plaintiffs bring this action to reaffirm and enforce their fundamental right to privacy, along with that of the Classes, which has been infringed by Adobe's wanton spying in violation multiple state and federal laws.

## II. JURISDICTION AND VENUE

9. Jurisdiction is proper under 28 U.S.C § 1332(d) because: (1) the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, (2) there are more than 100 putative members of the Class, and (3) Plaintiffs and a significant portion of Class Members are citizens of a state different from Adobe.

10. This Court has personal jurisdiction over Adobe because its principal place of business is in California. Additionally, this Court has personal jurisdiction over Adobe because a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in California, including Adobe's interception and use of Plaintiffs' unique identifiers and other personal data.

11. Venue is proper under 28 U.S.C. §1391(b), (c), and (d) because a substantial portion of the conduct described in this Class Action Complaint was carried out in this District. Furthermore, Adobe is headquartered in this District and subject to personal jurisdiction in this District.

12. This action arises in Santa Clara County, in that a substantial part of the events which gave rise to the claims asserted herein occurred in Santa Clara County. Pursuant to L.R. 3-2(e), all actions that arise in Santa Clara County shall be assigned to the San Jose Division.

## III. PARTIES

### A. Plaintiffs

13. Plaintiff Nicholas Rapak is a resident of Montgomery County, Pennsylvania.

14. Plaintiff Bianca Johnston is a resident of Big Bear, California.

15. Plaintiff Minchul Paul Chwe is a resident of New York County, New York. From 2020 until late August 2024, he was a resident of Los Angeles County, California.

16. Plaintiff Dana Olita is a resident of Philadelphia County, Pennsylvania. Until October 2024, she was a resident of Los Angeles County, California.

17. Unbeknownst to Plaintiffs, Adobe assigned each of them an Adobe Experience Cloud ID (ECID) when they visited and used websites and apps, described further in Exhibit A, that contain Adobe's tracking tools.

18. Adobe tracked, collected, processed and assembled Plaintiffs sensitive data for its own monetary gain.

19. Plaintiffs did not consent to Adobe's practice of tracking and monetizing their personal data, website and app activity, or offline data, including using that information to create profiles about them, nor did they consent the interception of their private communications, or incorporation of those communications in such profiles.

**B. Defendant**

20. Defendant Adobe is a Delaware corporation with its headquarters and principal place of business at 345 Park Avenue, San Jose, California 95110.

21. Adobe knowingly and intentionally developed persistent, unique identifiers to track Plaintiffs and Class Members across internet-connected services, despite knowing these types of identifiers were at odds with users' expectation of privacy.

22. Adobe knew that its identifiers, and especially Adobe Experience Cloud ID (ECID) and demdex cookie, circumvented existing privacy protections (like the deprecation of persistent device ID collection or third party cookie blocking) because it developed this identifier specifically as an alternative to such privacy-preserving mechanisms. *See* ¶¶ 37-59, below.

23. Adobe offered its Experience Cloud and other products to websites and/or mobile applications, so that it could acquire information about individuals that interacted with those services, and have a unique way of tracking Plaintiffs and Class Members across devices and platforms so that it could monetize that information, including through digital ads.

24. Adobe knowingly and intentionally used its identifiers, and data associated with them, to facilitate targeted advertisements for profit.

## IV. FACTUAL ALLEGATIONS

### A. Background

25. Individuals have a baseline expectation of privacy when using their personal computers and mobile devices to access websites and use mobile applications.

26. Consistent with this expectation, several state legislatures have proposed and passed data privacy laws aimed at protecting consumers. Additionally, many companies have begun to move away from, or adopt features designed to prevent, user based online tracking in recognition that it is privacy invasive. This began at least as recent as 2013, when Apple stopped allowing companies to collect Universal Device Identifiers (or "UDIDs"), which are permanent device identifiers that were used for online advertising. Similar changes followed over the next decade, with the roll out of additional features intended to enhance individual's privacy, like Apple's "Do Not Track" setting, which sought to limit the collection of advertising IDs from mobile device users, as well as updates by several browsers to block "third-party" cookies (i.e., text files placed on a user's device from domains they are not visiting), which have also historically been used to track users across multiple websites.

27. Adobe did the opposite. While other companies moved away from privacy-invasive tracking technology, Adobe sought to capitalize on this shift by building an entire ecosystem of products designed to work around such productions so it could track users regardless of browser, device, or settings.

28. Not surprisingly, selling the cheat code to the privacy-promoting innovations of other companies quickly became a large part of Adobe's business. Expanding beyond its consumer-facing identity as a maker of Adobe Acrobat or Photoshop, Adobe built sophisticated tracking and profiling systems, including the Adobe Experience Platform ("Experience Platform") and Adobe Experience Cloud ("Experience Cloud"), along with an entire advertising ecosystem that powers its own Demand Side Platform to solicits bids for targeted digital ads that leverage this data.

29. These systems are designed to collect, process, analyze, and monetize detailed personal and behavioral data on millions of internet users including Plaintiffs and other members of the Classes through several means. At their core, is Adobe's identity graph. Adobe identifies individuals by aggregating both first-party and third-party data from online and offline sources to build a comprehensive, persistent, and identifiable consumer profiles anchored to its proprietary ECID. These profiles underpin Adobe's targeted advertising, behavioral analytics, and real-time marketing products, which leverage information Adobe acquired about individuals from their web activity, as well as through its unauthorized sharing of information with other ad market participants through cookie syncing and auctions for digital ads (known as the "bidstream").

30. The breadth of Adobe's surveillance network is staggering. Adobe's technology is incorporated on more than 2,300 of the top 10,000 U.S. websites and thousands of additional mobile applications. For example, Plaintiffs have identified Adobe's tracking technology on highly trafficked web properties such as Bank of America, Delta Airlines, Marriot, Hilton, Hulu, CVS, Walgreens, and Barclays US, among many other others. Given the nature of these sites—which encompass individuals' financial activity, location, video viewing history, and health information—Adobe's presence is highly invasive as it is capturing sensitive information about users (*see* Exhibit A) who are completely unaware of and did not consent to this practice.

31. While Adobe profits from its data surveillance and marketing business have not been disclosed, Adobe's market cap recently exceeded $162 billion, making it one of the most valuable companies in the world.[1] This is a testament to the value of its vast corpus of data and advertising business, not PDFs and digital drawing tools.

**B. Adobe's Suite of Surveillance Tools and Services**

32. Adobe maintains a comprehensive suite of surveillance technologies deployed through its Experience Cloud, Experience Platform, Audience Manager, advertising systems, and associated services. These products and services are designed to systematically enhance Adobe's identity graph and advertising business by intercepting private communications with web

[1] FORBES, *Adobe*, https://www.forbes.com/companies/adobe/ (last visited May 5, 2025).

properties, collecting information that can identify and track individuals, and adding this to an identity profile that makes it possible to target specific individuals with ads across the internet.

33. Plaintiffs have created a detailed list that describes the principal cookies, pixels, identification tools, device tracking mechanisms, and supporting services employed by Adobe. *See* Exhibit B. These components, which are described below, enable Adobe to have virtually unchecked access to the personal information of hundreds of millions of people—even where the profiled individuals lack any direct relationship with Adobe or one of its clients.

34. Adobe's technologies are further designed to circumvent privacy enhancing features and controls to ensure that tracking persists regardless of user settings, browser controls, or device transitions, and that data from nearly every digital interaction is funneled, enriched, resolved to an individual profile, and actively monetized.

**ADOBE'S UNIQUE IDENTIFIERS**

35. Seeking to profit from the "rise in cookie regulation" and problems this posed for marketers who had long relied on such data to track individuals and target ads,[2] Adobe built a surveillance ecosystem tied to its own persistent, cross platform identifier—the ECID. Using its own identity system allowed Adobe to track individuals without the device identifiers or third-party cookies that had come under fire.[3] While Adobe marketed its services as privacy promoting, and part of "a third-party cookieless tomorrow,"[4] in reality the tracking possible with ECID and cookie syncing was *more* privacy invasive and problematic than any of its predecessors.

---

[2] Adobe Inc., Adobe Experience Platform's Identity Service: How to Solve the Identity Challenge, (Nov. 16, 2021), https://experienceleaguecommunities.adobe.com/t5/adobe-experience-platform-blogs/adobe-experience-platform-s-identity-service-how-to-solve-the/ba-p/431607?utm_source=chatgpt.com&lightbox-message-images-431607=36332i4E127A07454025C3. (last visited Apr. 1, 2025).

[3] Adobe Inc., Options To Mitigate The Effect Of Browser Cookie Limitations, Tech Notes, (Mar. 6, 2024), https://experienceleague.adobe.com/en/docs/analytics/technotes/cookies/cookieless#:~:text=Adobe%20Analytics%20relies%20on%20first,on%20other%20domains%20you%20own (last visited Apr. 1, 2025).

[4] ADOBE, *Adobe Audience Manager – Data management is changing. It's just the way the cookie crumbles.*, https://business.adobe.com/products/audience-manager/adobe-audience-manager.html (last visited May 5, 2025)

36. Adobe's first identity solution was called Adobe Analytics ID, now referred to as "legacy ID." This unique identifier is observable in network traffic as a cookie called s_vi and is often used as a first-party cookie that tracks a user across a single domain (e.g., www.citi.com).

37. Adobe expanded this project by developing the **Adobe Experience Cloud Identity Service**, which introduced the Adobe Experience Cloud ID (ECID), also known as "MID."[5] The ECID is a persistent, unique identifier Adobe assigns to each user that enables tracking across Adobe Experience Cloud products (e.g., Analytics, Target, and Audience Manager) as well as broader identity syncing with other advertising partners.[6] Through ECID, Adobe facilitates unified data collection and personalization consistently across mobile applications and websites.

38. For example, if a website domain owns two separate web properties, for instance, a hospital patient portal that uses Adobe Analytics and a public-facing marketing website that uses Adobe Target, the same ECID will be assigned to the same user, even though they are different Adobe services. The ECID is stored in the field s_ecid and/or in an AMCV cookie.[7] It can also be passed in parameters through network traffic. A single ECID cookie does not expire for two full years, allowing the individual to be tracked for an extended period of time.[8]

39. Adobe, however, also uses the ECID framework to track unique users across websites and online services owned by ***different*** companies. When a company initially sets the ECID, they call Adobe's "Data Collection Server" ("DCS") at the URL "dpm.demdex.net"[9] and transmit their "organization ID" to that server. Adobe's DCS processes this information and

---

[5] https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/ids-in-aam?

[6] https://experienceleague.adobe.com/en/docs/id-service/using/intro/overview?

[7] Adobe Inc., Experience Cloud Cookies, Experience Cloud Interface And Administration, (Apr. 25, 2024), https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/experience-cloud (last visited, Apr. 1, 2025).

[8] *Id*.

[9] NextRow, Third-Party Cookies: Why CNAME in Adobe Analytics, (Oct. 4, 2023), https://www.nextrow.com/blog/adobe-analytics/third-party-cookies-why-cname-in-adobe-analytics (last visited Apr. 1, 2025).
"DPM" itself stands for "Data Provider Match" and refers to Adobe's ID syncing process. See Adobe Inc., Glossary, Experience League, (Aug. 18, 2021), https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/aam-glossary (last visited, Apr. 1, 2025).

transmits back the user's ECID (identified in the Figure below as "MID") as well as a **demdex.net cookie**.[10] **Figures 1 and 2** below reflect Adobe's own documentation on this process:

**FIGURES 1 & 2**[11]




40. In the above example, the demdex.net cookie set for the unique visitor who visited "Food Company" is 5678. Because the demdex.net cookie is persistent across websites—even those owned and operated by different website providers—when the "Food Company" user visits a new website, the demdex.net cookie allows that individual to be identified within Adobe's identity graph and their activity tracked against the same MID.

[10] Adobe Inc., How the Experience Cloud Identity Service Requests and Sets IDs, (Nov. 10, 2022), https://experienceleague.adobe.com/en/docs/id-service/using/intro/id-request#:~:text=In%20the%20response%2C%20the%20DCS,belonging%20to%20the%20Food%20Company, (last visited Apr. 1, 2025).

[11] https://experienceleague.adobe.com/en/docs/id-service/using/intro/id-request#concept-2caacebb1d244402816760e9b8bcef6a

**FIGURE 3**[12]




41. This further described in **Figure 3**, which continues the same example by showing that when the previous "Food Company" customer visits "Sports Company" Adobe's DCS assigns the same demdex.net cookie—5678. Thus, Adobe knows the same unique individual who visited "Food Company" is the same unique individual who visited "Sports Company." This process allows Adobe's to track individuals' movements across the internet, including their interactions with different websites *unrelated to the customer*, such as the hospital above, that may use some of its technologies.

42. More problematic, the demdex cookie also syncs its cookie id with third-party data brokers and advertising and technology entities, a practice known as **ID Syncing** or **Cookie Syncing**. This allows other advertising companies and/or data brokers, like Adobe, to share identifiers with one another, permitting even more robust identification and tracking, for example, by allowing Adobe to identify individuals based on unique identifiers from *other* identity service providers, DSPs, or SSPs that are visible during real-time bidding auctions for digital advertising on other web properties. Adobe syncs cookies with at least the following third-party data brokers/advertising technology entities. Additional examples are attached as **Exhibit B**.

(a) TransUnion;

(b) LiveRamp;

[12] https://experienceleague.adobe.com/en/docs/id-service/using/intro/id-request

(c) Magnite;

(d) Oracle AddThis (no longer operational);

(e) Google DoubleClick;

(f) Microsoft Bing;

(g) Acuity Ads;

(h) Pro-market.net;

(i) OwnerIQ;

(j) Lotame;

(k) Tapad; and

(l) Flashtalking.

43. Furthering this privacy invasion, Adobe uses **CNAME Cloaking** (or masking) to ensure it obtains these identifiers (alongside other data) regardless of whether the individual is using a cookie blocker or a privacy-preserving browser. These tools are intended to allow consumers to ensure that interact only with websites they visit directly (i.e., "first-parity" sites) and to protect themselves from undesired data collection by third parties, like Adobe, who do not operate that web prosperity, through their own third-party cookies. Adobe's "CNAME implementations" is built to get around that, allowing Adobe to place cookies as though they originate from its customers' "first-party collection domain,"[13] circumventing cookie blockers designed to stop third-party cookies trackers. This systematic and purposeful deception highlights Adobe's intent, as well as the seriousness and offensiveness of its invasion of privacy.

44. Adobe knows this practice is deceptive and intended to defeat individuals' efforts to avoid tracking. Indeed, Adobe brags in documentation that "using CNAME can prevent your data collection from being disrupted for users employing these [cookie blocking] tools."[14]

---

[13] ADOBE, *CNAME implementation overview*, https://experienceleague.adobe.com/en/docs/id-service/using/reference/analytics-reference/cname (last accessed March 9, 2025).

[14] *Id.*

45. Adobe offers its CNAME implementation to *all* its clients, including those that obviously process sensitive information, such as health data. For example, one of Adobe's clients is Kelsey-Seybold Clinic, which operates more than 40 health clinics across 65 medical specialties. Kelsey-Seybold Clinic patients can use their website, which incorporates Adobe's technology, to locate a clinic, find a doctor, and schedule an appointment. Each of these pages not only incorporate Adobe's technology, but Adobe's CNAME implementation. Using this implementation, the endpoint for data transmissions is set to "smetrics.optom.com" which would be registered by certain cookie blockers as a first-party domain (optom.com leads to Total Vision Clinics). Accordingly, these cookie blockers would *not* block transmissions to this domain even though, in reality, it is not truly a first-party domain but a transmission to third party Adobe. This allows Adobe to avoid cookie blockers. Even the most savvy consumers are also unlikely to know that a cookie listed as a *first-party* cookie on a non-Adobe website belongs to Adobe, because it would be illogical for a "first-party" cookie to belong to a third-party.

46. Additionally, it is functionally impossible for the average internet user to avoid an encounter with Adobe's **demdex cookie**; the cookie is present on thousands upon thousands of websites, including highly popular ones like Amazon.com and LinkedIn.com. Although far from an exhaustive list, Plaintiffs have identified 1,300 examples in **Exhibit C**.

47. The average consumer could not possibly be aware or able to detect that Adobe begins collecting their information when they visit websites featuring Adobe's cookies and that it subsequently follows them across the internet. Even if the consumer monitors their web browser to evaluate which cookies are tracking them, the demdex cookie will reflect that it originates from the demdex.net domain, with no indication that the cookie in fact belongs to Adobe.

48. Figure 4, below, is an example. This figure shows a list of cookies on the Coca-Cola.com, as they appear in the cookie opt out popup. These cookies are listed based upon the domain that they are hosted on, and clearly associated with their origin. For example, cookies from "TikTok.com" are owned by TikTok, the "Google.com" domain are owned by Google, and so on.

There is no listing for Adobe.com here, despite the fact that Adobe controls *three* of the domains with cookies – dpm.demdex.com, demdex.net, and everesttech.net.

* * *

**FIGURE 4**




49. The demdex cookie is also particularly nefarious because it circumvents many of the anti-cookie protections that have been put in place for the benefit of consumers who do not want to be followed across the internet. For instance, individuals are increasingly met with cookie consent popup that asks whether they consent to the placement of non-essential cookies (including third-party cookies) as they navigate the internet. Even if the user indicates that they do not consent to the placement of non-essential cookies, this decision has *no effect whatsoever* on the demdex

cookie. The demdex cookie is placed on the user's device near-instantaneously – within milliseconds – when they navigate to a website, ***before*** any consent is solicited by the website itself. Consequently, the cookies are already placed by the time the popup appears, and indicating that the user does not consent to the placement of non-essential cookies will not affirmatively remove cookies that have *already been placed* like the demdex cookie. Thus, not only is the name of the demdex cookie intended to conceal its identity, it is placed in a way that circumvents opt out controls to track users even when they think are not being followed.

50. Although not exhaustive, the list below includes additional tracking cookies and unique identifiers Adobe employs:

- **AMCV/AMCV_{OrgID}:** Experience Cloud/Analytics persistent cookie issuing Experience Cloud ID ("ECID" or "MID"), Adobe's master identifier for user cross-site and cross-service tracking.
- **everest_gv2 and everesttech (everesttech.net):** Trackers for session persistence, domain hopping, and ad campaign attribution.
- **dextp:** Cookie for real-time audience management sync, facilitating data flows between Adobe and major adtech brokers such as LiveRamp and Tapad.
- **s_vi, s_fid, s_ecid, sfid, s.visitorID:** Legacy and fallback identifiers maintaining visitor persistence as supplementary or backup to ECID-based tracking. [15][16]
- **id.adcloud:** Assigned for integration with Adobe Advertising Cloud: cross-network campaign and conversion capture.
- **Mobile Advertising IDs (IDFA for iOS, GAID for Android**): Cross-app device identifiers reconciled within Adobe's identity platform and tie into the persistent user profile.
- **IP Address (obfuscated/enhanced):** Used for general and household geolocation, device uniqueness, session stitching, and to circumvent user login requirements in some flows.

---

[15] Adobe Inc., Adobe Analytics Cookies, (Oct. 14, 2024), https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/analytics#section-5d50a078de444d12b7d927d68ff3b679 (last visited Apr. 1, 2025).

[16] Adobe Inc., visitorID, (Mar. 6, 2024), https://experienceleague.adobe.com/en/docs/analytics/implementation/vars/config-vars/visitorid (last visited Apr. 1, 2025).

- **Email hashes, CRM IDs, login/account credentials, loyalty numbers:** Imported directly or through customer "onboarding" to unify online and offline identities.

51. These identifiers are the beating heart of Adobe's spying apparatus, and allow Adobe to achieve cross-device linkage and data syncing, which it uses to identify the users whose private interactions it intercepts across the web to develop individually identifiable profiles.

**ADOBE'S COMPREHENSIVE IDENTITY SOLUTION**

52. To complement its extensive collection of cookies and identifiers, Adobe also launched the **Adobe Experience Platform Identity Service** to profile users.[17]

53. The Adobe Experience Platform Identity Service is designed to keep identity tracking consistent when the same user logs in or interacts with a website from multiple devices, such as from their phone and then their laptop, which would otherwise create multiple, disparate identifiers. Through this service, Adobe collects all the identifiers across devices and websites and links that to an "identity graph" through what it calls its "**Identity Graph Generator**." This associates all the known identifiers with the same individual, even though they would previously appear as multiple unique users.

* * *

**FIGURE 5[18]**

[17] Adobe Inc., Monitor Dataflows For Identities In The UI, (July 23, 2024), https://experienceleague.adobe.com/en/docs/experience-platform/dataflows/ui/monitor-identities#:~:text=Adobe%20Experience%20Platform%20Identity%20Service,the%20status%20of%20identity%20processing (last visited Apr. 1, 2025).

[18] https://experienceleague.adobe.com/en/docs/experience-platform/identity/home




54. As shown in **Figure 5**, through the Adobe Experience Platform Identity Service, Adobe receives identifiers, such as ECIDs, IP address, Login IDs, and email addresses, which it can then reconcile as the same user through its Identity Graph Generator.[19]

55. Adobe incredibly bills its identity solution as gathering "PII data" in an "anonymized fashion"—and impossibility as both cannot be true at the same time. "Strong forms of identity" like PII data is exactly the opposite of anonymized data.

**FIGURE 6[20]**




56. Despite its characterization, Adobe knew that this solution was ***better*** at tracking individuals than previous identifiers, including those being deprecated, and was not anonymized.

[19] Adobe Inc., Adobe Experience Platform Identity Service, (Aug. 18, 2024), https://experienceleague.adobe.com/en/docs/experience-platform/identity/home (last visited Apr. 1, 2025).

[20] Adobe Inc., Experience Platform Identity Service, https://business.adobe.com/products/experience-platform/identity-service.html (last visited Apr. 1, 2025).

Indeed, Adobe actively markets its identity solution as unique because it identifies the specific "***people behind the devices***," i.e., the people who, through Adobe's tracking and re-identification, are no longer anonymous.

**FIGURE 7**[21]




57. As shown in **Figure 7**, Adobe itself does not see its identity solutions as either a "session" or "device" level identifier, but a way to identify actual people, akin to a social media profile. **Figure 8** below depicts what this profile looks like in the Adobe dashboard.

**FIGURE 8**




58. In fact, Adobe's identity solutions are ***stronger*** identifiers than those that previously existed, as Adobe itself acknowledges. For instance, most first-party cookies are limited in that

[21] Id.

they only track a user on one specific website.[22] Adobe's Experience Platform Identity Service goes much further, by tracking users across permanent identifiers, such as email address and IP address, and first-party cookies like ECID.[23] This makes it possible to create an identity profile that serves advertisers' needs, by aggregating data across all apps and websites a person uses that incorporates Adobe's technology, at the expense of individual's right to privacy.

59. Adobe's status as an identity broker allows it to track users across the internet and develop unique profiles, which Adobe then offers to its customers to use with Adobe's other marketing and analytics products at a price premium.[24]

## ADOBE'S DATA COLLECTION METHODS

60. Adobe created the Experience Platform Identity Service precisely because of its synergy with its existing (and pricey) analytics, advertising, and AI products. Collectively, all of these services are referred to as the **Adobe Experience Cloud Platform**.[25] A subset of the services included in the Adobe Experience Cloud Platform are described below. Each of these tools are used to facilitate the collection of unique identifiers, private data, and profile users for use in digital advertising.

61. One of the products Adobe offers is **Adobe Analytics,** which includes its **Data Collection Tag** (dtm.adobedtm.com, assets.adobetm.com).[26] This Adobe Data Collection Tag is

---

[22] Hannah Barnstore, What is a First-Party Cookie?, KETCH BLOG, (Feb. 12, 2025), https://www.ketch.com/blog/posts/what-is-a-first-party-cookie (last visited Apr. 1, 2025).

[23] Adobe Inc., Privacy and Identity Data in Adobe Experience Platform, (Jan. 21, 2024), https://experienceleague.adobe.com/en/docs/experience-platform/privacy/identity-data#:~:text=ECID%20and%20Opt%2Din%20Service,described%20in%20the%20next%20section (last visited Apr. 1, 2025)

[24] Adobe Inc., Real-Time Customer Profile Overview, (Feb. 23, 2025), https://experienceleague.adobe.com/en/docs/platform-learn/tutorials/profiles/understanding-the-real-time-customer-profile#:~:text=Using%20the%20identity%20graph%20Adobe%20dynamically%20assembles,customer%20profile%20and%20Experience%20Platform%20is%20easy (last visited Apr. 1, 2025).

[25] Adobe Inc., Creativity And Marketing In The Age Of AI, Adobe for Business, https://business.adobe.com/ (last visited Apr. 1, 2025).

[26] In addition to Adobe Data Collection Tag, Adobe also permits online services to send data directly to Adobe via a server-to-server connection, which avoids detection, as such data

deployed directly on web pages and mobile applications.[27] When used, the Data Collection Tag automatically captures the ECID, along with other data and identifiers, including browser type, device characteristics, and IP address.[28] It also collects more sensitive data revealing the user's communications with the website provider, including pages they visited, searches they conducted, and more.[29] This information is transmitted directly to Adobe's own servers, as indicated by Adobe owned domains like demdex.net and adobedc.net.[30]

62. The Adobe Data Collection Tag intercepts the Adobe Experience Cloud ID (ECID) and online users' private communications directly from webpages and redirects it to its own servers, aggregating that information with a user's profile, so it can be used for advertisements, including the creation of custom audiences, lookalike audiences, and campaign optimization.[31]

---

transfers cannot be observed by reviewing network traffic. This compounds the egregiousness of Adobe's privacy violation, as so much of its conduct already occurs in secret. https://experienceleague.adobe.com/en/docs/experience-platform/web-sdk/faq#:~:text=With%20Experience%20Platform%20Web%20SDK,common%20aforementioned%20solution%20use%20cases.&text=Other%20solutions%20will%20follow.,the%20server%2Dside%20solution%20schema.

[27] Adobe Inc., Data Collection Overview, (Feb. 5, 2025), https://experienceleague.adobe.com/en/docs/experience-platform/collection/home#:~:text=Adobe%20Experience%20Platform%20provides%20a,the%2Dtop%20(OTT)%20applications (last visited Apr. 1, 2025).

[28] Adobe Inc., Ingest Data via the Web SDK, (Dec. 11, 2024), https://experienceleague.adobe.com/en/docs/analytics-platform/using/cja-data-ingestion/ingest-use-guides/edge-network/aepwebsdk#:~:text=You%20now%20want%20to%20set,Select%20Save. (last visited Apr. 1, 2025).

[29] Adobe Inc., Behavior Reports, (Apr. 9, 2023), https://experienceleague.adobe.com/en/docs/analytics/technotes/ga-to-aa/reports/behavior-reports#:~:text=Site%20Content%20%2D%20All%20Pages,to%20obtain%20each%20respective%20metric. (last visited Apr. 1, 2024).

[30] Adobe Inc., Identity Data in Web SDK, (Feb. 3, 2025), https://experienceleague.adobe.com/en/docs/experience-platform/web-sdk/identity/overview#:~:text=Third%2Dparty%20data%20collection%20involves,Adobe%20data%20collection%20endpoints%20altogether (last visited Apr. 1, 2024).

[31] https://experienceleague.adobe.com/en/docs/experience-platform/segmentation/types/lookalike-audiences#:~:text=In%20Adobe%20Experience%20Platform%2C%20Look%2Dalike%20audiences%20provide,target%20customers%20similar%20to%20previously%20converted%20audiences; https://experienceleague.adobe.com/en/docs/experience-platform/destinations/catalog/adobe/experience-cloud-audiences#:~:text=Supported%20identities,Learn%20more%20about%20identities.&text=A%20namespace%20that%20represents%20ECID,on%20ECID%20for%20more%20information.&text=Profiles%20ingested%20into%20Real%2DTime,be%20exported%20to%20this%20destination

63. In addition to the Adobe Data Collection Tag, Adobe uses the following additional technologies to extract and combine the data listed above from thousands of websites and applications, as well as other private data, such as users queries, searches, and browsing habits and other activity:

- **Web beacons ("clear GIFs"):** Tiny pixel elements loading alongside web/app resources, signaling user behavior (e.g., page loads, clicks, conversions) directly to Adobe.
- **Adobe Software Development Kits ("SDKs") (Android/iOS):** Software libraries integrated in thousands of mobile apps, capturing device IDs, geolocation, app-specific interactions, and enabling silent tracking even when apps are backgrounded.
- **Plug-ins (getGeoCoordinates):** Specialized tools embedded in websites and apps for acquiring granular geocoordinate (latitude/longitude) data.
- **Server-Side Tracking:** Adobe also engages in server-side, real-time tracking, spatial tracking and geolocation monitoring, and external data enhancement.

64. Taken as a whole, its suite of surveillance tools, and the data gathered by those tools and tracking methods, are used to offer and enhance its marketing services, including identity resolution programs, analytics services, and more.

## ADOBE'S MONETIZATION AND USE OF PLAINTIFFS' AND THE CLASSES' DATA

.&text=ID%20for%20Advertisers-,Profiles%20ingested%20into%20Real%2DTime%20CDP%20with%20a%20primary%20identity,be%20exported%20to%20this%20destination.&text=the%20SHA256%20algorithm-,Profiles%20ingested%20into%20Real%2DTime%20CDP%20with%20a%20primary%20identity,be%20exported%20to%20this%20destination.

65. The data collected through the Adobe Data Collection Tag and these other tools is used for developing complex analytics, which reveal more information about the user than the data itself.

66. For instance, Adobe offers **Predictive Analytics** (powered by Adobe Sensei), which is bills as "[p]redicting the future" i.e., future actions likely to be taken by the unique users whose data Adobe intercepted.[32] As Adobe explains, "[h]idden in [the] data" are "patterns" that reveal additional "meaningful insights" that can be "used effectively" (through Adobe, of course) to have a "very real impact on the bottom line."[33] Adobe provides predictive analytics by running the intercepted data through "machine learning and advanced statistical models" to "dig automatically through [the] enormous amounts of data" and uncover new "insights" about the user.[34]

67. **Adobe Audience Manager** is yet another product in the Adobe Experience Cloud Platform that works with Adobe Analytics and the Adobe Experience Platform Identity Service.[35] In Adobe Audience Manager, Adobe customers can use its "proprietary algorithm" called "TraitWeight" to discover "new, unique audience members."[36] The Adobe customer selects users and "trait[s]" or "segment[s]" associated with them—as identified through Adobe Analytics and the Adobe Experience Platform Identity Service—and then sends Adobe's algorithm to search the existing database for individuals likely to take similar actions as the originally selected individuals. Adobe's algorithm provides a "weighted score" reflected how similar the newly identifiers users

[32] Adobe Inc., Predictive Analytics in Adobe Analytics, https://business.adobe.com/products/analytics/predictive-analytics.html (last visited Apr. 1, 2025).
[33] *Id.*
[34] https://business.adobe.com/products/analytics/predictive-analytics.html
[35] https://blog.adobe.com/en/publish/2012/10/22/introducing-look-alike-modeling-with-adobe-audiencemanager
[36] https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/features/algorithmic-models/look-alike-modeling/understanding-models

are to the ones initially selected.[37] Adobe Analytics can send data to Adobe Audience Manager in real-time through server-side forwarding.[38]

68. **Adobe Campaign** similarly integrates with Adobe Analytics and the Adobe Experience Platform Identity Service. Adobe allows customers to use their "Analytics data directly in [Adobe] Campaign" with customer's other "email engagement data."[39] Used together, Adobe customers can use audiences created in Adobe Analytics to send "personalized messages" based on "actions" they have taken on a website.[40] Using "AI" Adobe Campaign can discern and "predict the best send times" that are the "most likely" to get customers to "engage."[41]

69. Likewise, **Adobe Marketo Engage** also syncs with Adobe Analytics and the Adobe Experience Platform Identity Service.[42] Adobe Marketo Engage tracks data like lead details, including users who completed forms, viewed certain pages, or engaged in email interactions.[43] This data is synced through the Adobe Experience Platform Identity Service with data from Adobe Analytics in a unified profile.[44] Adobe Analytics then enriches the Marketo Engage data to create lead scores and generate follow-up content to convert the lead to a customer or achieve some other marketing goal (i.e., converting to a paid customer, start trial, etc.).

70. **Adobe Journey Optimizer** is yet another product that can be integrated with Adobe Analytics and the Adobe Experience Platform Identity Service.[45] Adobe Journey Optimizer

---

[37] https://blog.adobe.com/en/publish/2012/10/22/introducing-look-alike-modeling-with-adobe-audiencemanager
[38] https://experienceleague.adobe.com/en/docs/analytics/admin/admin-tools/manage-report-suites/edit-report-suite/report-suite-general/server-side-forwarding/ssf
[39] https://business.adobe.com/products/campaign/analytics-integration.html
[40] *Id.*
[41] https://business.adobe.com/products/campaign/adobe-campaign.html
[42] https://experienceleague.adobe.com/en/docs/marketo-measure/using/marketo-measure-and-adobe/marketo-measure-integrations-with-adobe-analytics?
[43] https://experienceleague.adobe.com/en/docs/marketo-developer/marketo/javascriptapi/leadtracking/lead-tracking#:~:text=Marketo's%20Munchkin%20JavaScript%20allows%20for%20tracking%20of,filters%20for%20Smart%20Campaigns%20and%20Smart%20Lists.
[44] https://experienceleague.adobe.com/en/docs/marketo/using/product-docs/web-personalization/reporting-for-web-personalization/web-analytics-integrations/integrate-with-adobe-analytics
[45] https://business.adobe.com/products/journey-optimizer.html#watch-video

allows customers to track user's interactions on a web property, and trigger certain responses based on the actions they take.[46] For instance, if a user adds an item to cart, but does not purchase it, Adobe Journey Optimizer flags this interaction and can be used to create the "perfect offer" to get the user to "engage" and "convert" by developing "targeted content."[47] Adobe's AI can develop the targeted content directly for the Adobe customer.[48]

71. Finally, **Adobe Advertising** also integrates with Adobe Analytics and the Adobe Experience Platform Identity Service.[49] Combining Adobe Analytics with Adobe Advertising and Adobe Experience Platform Identity Service enables customers to perform remarketing, measure ad performance, and engage in campaign optimization based on unique user profiles compiled by Adobe. Adobe Advertising customers can use these profiles to buy, manage, and optimize advertisements directly through Adobe, which acts as a Demand Side Platform for real-time bidding auctions.[50] Adobe encourages customers to integrate Adobe Advertising with its other products precisely to provide this hyper-specific type of targeting and ad bidding.[51]

| **Adobe Product** | **Integrates with Adobe Analytics** | **Integrates with Adobe Identity Solution** |
| --- | --- | --- |
| Adobe Audience Manager | ✓ | ✓ |
| Adobe Campaign | ✓ | ✓ |
| Adobe Marketo Engage | ✓ | ✓ |
| Adobe Journey Optimizer | ✓ | ✓ |
| Adobe Advertising | ✓ | ✓ |

[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] https://business.adobe.com/resources/sdk/adobe-advertising-dsp-tips-tricks.html
[50] https://business.adobe.com/products/advertising/demand-side-platform.html
[51] https://business.adobe.com/products/advertising/integrations.html

## ADOBE'S UNIQUE & COMPREHENSIVE USER PROFILES

72. Adobe offers a clear and easy way to combine the power of most of its marketing and analytics tools (including Adobe Analytics and Adobe Advertising) with the Adobe Experience Platform Identity Service all in one place. This is known as **Adobe Real-Time CDP**.[52]

73. The Adobe Real-Time CDP ingests data from multiple sources (e.g., Adobe Analytics, offline data, and other integrated sources)[53], and then uses the Adobe Experience Platform Identity Service to stitch this data into a comprehensive profile, tracking ***both*** identity and user's unique (and private) interactions.[54] **Figure 9** explains how Real-Time Customer Profiles are used with Adobe's other services.

**FIGURE 9[55]**




74. This Adobe-Real Time Customer Profile is depicted in **Figure 10**.

[52] chromeextension://efaidnbmnnnibpcajpcglclefindmkaj/https://business.adobe.com/content/dam/dx/us/en/resources/guides/b2c-edition-rt-cdp-platform/B2C-Edition-Overview-Real-time-CDP-v1.1.pdf?
[53] Other integrated sources can include, for example, Acxiom and Merkury data. Both are data brokers.
[54] chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://business.adobe.com/content/dam/dx/us/en/resources/guides/b2c-edition-rt-cdp-platform/B2C-Edition-Overview-Real-time-CDP-v1.1.pdf?
[55] https://experienceleague.adobe.com/en/docs/experience-platform/profile/home

**FIGURE 10[56]**




75. As shown in **Figure 10**, Adobe Real-Time CDP includes a dashboard similar to the identity graph (i.e., listing name, Profile ID, address, phone number, and linked identities (like ECID)), but also provides even ***more*** information as indicated by the tabs at the top. This profile includes user's "attributes", "accounts", "opportunities", "source records", "events", and "Audience membership."

76. Using Adobe Real-Time CDP, Adobe aggregates all the user's activities at the account level and attaches them to the user's profile.[57] Adobe Real-Time CDP allows Adobe customers to create audiences directly through this dashboard, which allows filtering based on unique user attributes.[58] For instance, a customer can select a custom age range (35-44), gender (female), and even more specific behavioral information like whether the individuals in the audience are "health conscious." Adobe Real-Time CDP will then search and analyze all other users and find those who fit the audience requirements.

[56] https://business.adobe.com/products/real-time-customer-data-platform/create-enhance-customer-profiles.html#marquee
[57] https://experienceleague.adobe.com/en/docs/experience-platform/rtcdp/profile/profile-overview
[58] https://experienceleague.adobe.com/en/docs/experience-platform/rtcdp/segmentation/customer-ai

77. Adobe customers can also "enrich" user profiles using Adobe's intelligence services, as well as generate propensity scores (i.e., how likely they are to take a certain action or churn) and create new leads.[59] All this new information is added back to the user profile. Adobe Real-Time CDP thus enabled comprehensive advertising and marketing at the user-level—exactly what current privacy mechanisms are designed to avoid.

78. The purpose of all this data aggregation is to target digital ads. Each of Adobe's services decided are designed to work together to ensure that Adobe's DSP gets a head start on matching individuals to ads. As explained above, Adobe's identity graph and associated services, like Adobe Audience Manager or Experience Cloud, ingest and aggregate data from multiple sources to allow precise "visitor identification" of each individual who reaches a website or app. Identity syncing across Adobe "partners" further amplifies Adobe's ability to identify individuals' information disclosed during the real time bidding process.

79. Pursuant to advertising industry standards, each bid for an ad must contain a user object with certain information, including at least: (1) a user id, which is the ad exchange's identifier for that individual, or (2) a user buyer id, which is unique identifier for that individual mapped to a particular DSP. Cookie syncing, as described above, allows Adobe to learn these values and associated them with profiles in its own identify graph so that its DSP immediately recognizes and individual in its system the instant a bid for an ad comes in. The more "partners" Adobe syncs its cookies with, the more powerful this becomes as more recent versions of the real time bidding standard have allows for multiple third party user IDs to be included with each bid.

80. This is where Adobe's identity graph becomes extremely valuable. Once Adobe's DSP is able to match the user ID from a bid to a profile in its system it can enrich the bid evaluation with *all known data* about that individual. Better matching leads to more targeted ads being served for Adobe clients, and greater profits for Adobe. It also allows Adobe to track "conversions" (e.g.,

[59] https://experienceleague.adobe.com/en/docs/experience-platform/rtcdp/use-cases/profile-enrichment/supplement-first-party-profiles

whether individual clicked ads or made purchases based on ads), which is just another invasion of individuals privacy.

**C. Real-World Examples & Plaintiffs' Experience**

81. Plaintiffs' expert confirmed in live testing that Adobe's technology was collecting numerous points of data that could reveal highly sensitive information about a user, including their specific searches and queries. This includes, but is not limited to: (a) when a user added items to their online shopping cart; (b) the titles of the video content a user streamed on a popular streaming website; (c) the titles of news articles that a user clicked on; and (d) whether a user sought to schedule a medical appointment with a health care provider and which specific clinic they intended to schedule the appointment with.

82. Each Plaintiff visited websites and/or mobile applications that incorporated a host of Adobe's surveillance tools and services encompassed in the Adobe Experience Cloud Platform. These experiences are described below:

***Plaintiff Rapak's Experience***

83. Plaintiff Rapak visited several websites that incorporate Adobe's tracking technology while using his Chrome and Firefox internet browsers.

84. Through the present, Plaintiff Rapak's browsing habits have remained consistent. When prompted by websites, his default practice is to opt out of third-party cookie collection.

85. Plaintiff Rapak is a Marriott Bonvoy member who frequently visits the Marriott website, which incorporates a host of services encompassed in the Adobe Experience Cloud Platform.

86. Marriott's web properties include the Adobe Experience Platform Launch script. This can be observed through developer tools common on many web browsers, which indicates the script is triggering a request to "assets.adobetm.com." This script enables Adobe products to work together and defines who and when "tags" fire based on the individual's interactions on a page, which are known as events.

87. Separately, Marriott's web properties also incorporate Adobe Analytics, as indicated by the presence of "AppMeasurement.min.js" and Adobe Audience Manager, as confirmed by "Module_AudienceManagement.min.js."

88. Without Plaintiff Rapak's knowledge or consent, Adobe's tracking technology caused his browser to send detailed information regarding the content of his communications with the Marriot website, revealing personal tastes and preferences.

89. Network traffic shows that, when a Marriott user, like Plaintiff Rapak, takes action on the Marriott website, such as browsing for hotels, Adobe intercepts (1) ECID; (2) the previously full-string URL the user visited (for example, showing the user moved from search results to calendar view for hotel prices); (3) the present full-string URL (for instance, indicating the user is viewing the "Rate[]Calendar" for a property with the ID code for the property selected, such as MIATX (i.e., Miami Airport Marriott); and (4) the Company ID (indicating the entity being communicated with is Marriott). The details of the content unlawfully collected by Adobe are provided in Exhibit A, paragraph 26.

90. Had Plaintiff Rapak known that Adobe was gathering information about his activities on these websites in ways that circumvented cookie blockers, and/or creating profiles of him by surreptitiously tracking his activity across the internet, he would not have used these services or otherwise would have demanded payment for his valuable data.

***Plaintiff Johnston's Experience***

91. Plaintiff Johnston visited several websites that incorporate Adobe's tracking technology while using her Firefox web browser.

92. Through the present, Plaintiff Johnston's browsing habits have remained consistent. When prompted by websites, her default practice is to opt out of third-party cookie collection.

93. Plaintiff Johnston is a patient of CVS pharmacy and Walgreens who frequently visits those websites and logs into her accounts, both of which incorporate a host of services encompassed in the Adobe Experience Cloud Platform.

94. Plaintiff Johnston also uses WebMD on a regular basis in relation to her own medical conditions, symptoms, and related concerns.

95. Each of these web properties include the Adobe Experience Platform Launch script. This can be observed through developer tools common on many web browsers, which indicates the script is triggering a request to "assets.adobetm.com." This script enables Adobe products to work together and defines who and when "tags" fire based on the individual's interactions on a page, which are known as events.

96. Separately, these web properties also incorporate Adobe Analytics, as indicated by the presence of "AppMeasurement.min.js" and Adobe Audience Manager, as confirmed by "Module_AudienceManagement.min.js."

97. Without Plaintiff Johnston's knowledge or consent, Adobe's tracking technology caused her browser to send detailed information regarding the content of her communications with the CVS, Walgreens, and WebMD websites, revealing her personally identifiable information and protected health information.

98. Network traffic shows that, when a person uses the CVS, Walgreens, and WebMD websites, like Plaintiff Johnston did, such as accessing and obtaining information related to her medical care, Adobe intercepts (1) ECID; (2) the previously full-string URL the user visited; (3) the present full-string URL; and (4) the Company ID (indicating the entity being communicated with is CVS, Walgreens, or WebMD). The details of the content unlawfully collected by Adobe are provided in Exhibit A, paragraph 26.

99. Had Plaintiff Johnston known that Adobe was gathering information about her activities on these websites in ways that circumvented cookie blockers, and/or creating profiles of her by surreptitiously tracking her activity across the internet, she would not have used these services or otherwise would have demanded payment for her valuable data.

***<u>Plaintiff Chwe's Experience</u>***

100. Plaintiff Chwe visited several websites that incorporate Adobe's tracking technology while using his Google Chrome internet browser.

101. For the four years prior to August 2024, Mr. Chwe had been a resident of Los Angeles. In August 2024, he moved with his family to Queens, New York, where he still resides. Both during his time as a California resident, and through to the present, his browsing habits have remained consistent. When prompted by websites, his default practice is to opt out of third-party cookie collection.

102. Typical websites he visited while living both in California and since while living in New York include, but are not limited to, websites for the provider of his most-used credit card, CITI, for information about various sports teams he follows (including ESPN and sites affiliated with the Los Angeles Lakers), and for the airline he typically uses in order to travel to his opera engagements, Delta.

103. Without Plaintiff Chwe's knowledge or consent, Adobe's tracking technology caused his browser to send detailed information regarding the content of his communications with the ESPN, CITI, and Delta websites, revealing personal tastes and preferences.

104. Network traffic shows that when a visitor to the Delta website, like Plaintiff Chwe, browses for flights on the Delta website, Adobe intercepts sensitive information, such as the specific dates they intend to travel on and the airports they intend to visit. The details of the content unlawfully collected by Adobe are provided in Exhibit A, paragraph 29.

105. Had Plaintiff Chwe known that Adobe was gathering information about his activities on these websites in ways that circumvented cookie blockers, and/or creating profiles of him by surreptitiously tracking his activity across the internet, he would not have used these services or otherwise would have demanded payment for his valuable data.

***Plaintiff Olita's Experience***

106. Plaintiff Olita visited several websites that incorporate Adobe's tracking technology when using her Google Chrome internet browser on her computer and phone.

107. Prior to October 2024, Ms. Olita had been a resident of Los Angeles County, California, and has since lived in Philadelphia County, Pennsylvania. When prompted by websites, her default practice is to opt-out of third party cookie collection.

108. Typical websites that Ms. Olita visited while living in California and since moving to California include, but are not limited to, Amazon, which she visits near-daily for her shopping needs, Wells Fargo, her bank, and CITI and Capital One, with which she has credit cards.

109. Without Plaintiff Olita's knowledge or consent, Adobe's tracking technology caused her browser to send detailed information regarding the content of her communications with the Amazon, Wells Fargo, CITI, and Capital One websites, revealing personal tastes and preferences.

110. Network traffic shows that when a visitor to the CITI website, like Plaintiff Olita, navigates the website, Adobe intercepts sensitive information, such as their customer ID, whether they are members of specific CITI programs (such as "Citigold" – a wealth management service), and how many credit cards they hold with CITI. The details of the content unlawfully collected by Adobe are provided in Exhibit A, paragraph 31.

111. Had Plaintiff Olita known that Adobe was gathering information about her activities on these websites in ways that circumvented cookie blockers, and/or creating profiles of her by surreptitiously tracking her activity across the internet, she would not have used these services or otherwise would have demanded payment for her valuable data.

***Other Examples***

112. Notably, these are just examples. Thousands of other websites also incorporate services encompassed within the Adobe Experience Cloud Platform.

113. For instance, when an individual visits Cedars-Sinai's website, this also triggers the Adobe Experience Platform Launch script. Like above, this can be observed through developer tools, which indicates the script is triggering a request to "assets.adobetm.com."

114. If a user navigates to Cedar-Sinai's primary care page and then proceeds to the online scheduling page, this information is intercepted by Adobe based on a review of the network traffic. Adobe receives: (1) ECID; (2) the previous full-string URL the user visited (www.cedars-sinai-org/programs/primary-care.html); (3) the present full-string URL (www.cedars-sinai.org/programs/primary-care/digital-scheduling.html); (4) that the user is engaging in online

schedule (as indicated by "hasOnlineScheduling:true"); (5) the Adobe Org ID (indicating the data comes from Cedar Sinai); and (6) the Company ID (relaying the same as Adobe Org ID).

115. This data is sent to Adobe Edge Network, which is used by Adobe's Customer Journey Analytics (CJA), Adobe Real-Time CDP, Adobe Journey Optimizer, and Adobe Target. These destinations suggests that Cedars-Sinai compiles this data in, at least, Adobe Real-Time Customer Profiles (described above). Indeed, Adobe automatically promotes customers using Adobe Experience Platform Edge Network to send and merge the data with Real-Time Customer Profiles.[60]

116. Separately, users who visit Cedars-Sinai trigger "AppMeasurement.min.js" which indicates that Cedars-Sinai is also an Adobe Analytics customer using its traditional integration. This script also enables sending data directly to Adobe Analytics.

### D. Plaintiffs and Class Members have a Reasonable Expectation of Privacy, and Adobe Failed to Obtain their Consent or Provide the Ability to Opt-out.

117. Internet users do not expect to be tracked across every single one of their internet-connected devices, including their web browser, apps, TVs, and more.

118. Indeed, the advent of privacy-preserving mechanisms like Apple's "Do Not Track" feature, which can prevent companies from collecting IDFA/ADID from individuals who opt-out, and similar features described above, have confirmed this expectation.

119. One study by Flurry Analytics in 2021 shows that 88% of iOS users worldwide have availed themselves of this feature, indicating an intent to prevent apps from tracking them on their mobile devices.

120. Users do not know—and did not expect—that Adobe would circumvent these protections by creating a proprietary, persistent identifier that is even more powerful than IDFA/ADID at tracking them across services.

121. Adobe itself does not provide any information for Plaintiffs and Class Members to understand which websites or online services use ECID or any of Adobe's other privacy-offending

[60] https://experienceleague.adobe.com/en/docs/analytics-platform/using/cja-data-ingestion/ingest-use-guides/edge-network/aepwebsdk?

products, such that they have no way of uncovering which services do or do not contain Adobe's tracking technology.

122. Plaintiffs and Class Members reasonably expect that their online activity would not be tracked by an unknown company, let alone that it would be used to target them across online services for profit.

123. Adobe did not have consent to perform this type of omni-present cross-device tracking using Plaintiffs' and Class Members' unique identifiers and private communications.

124. Simply put, consumers who are followed across the internet by Adobe and corporate clients enabled by Adobe are given no real say in the matter, and the tracking is essentially secret and invisible.

125. Adobe's cookies are strategically named to disguise its involvement, and they are designed to get around conventional blockers of third party cookies: third-party cookie blockers are ineffective at blocking any Adobe third-party cookies that use their corporate client's domains to spoof a first-party cookie. Moreover, deleting the cookies offers only a temporary reprieve; the next time the user visits a website with the demdex cookie, it will simply be placed on that user's device again (and again, placed before a user would even have the chance to opt out).

126. Even a user specifically desiring to rid himself of Adobe's tracking—if they knew it existed (and they would not)—would find it incredibly difficult to do so, as the formal solution to this problem offered by Adobe is convoluted at best. First, and somewhat counterintuitively, a user impacted by an Adobe third-party cookie must set their browser to *accept* third-party cookies in order to opt out of Adobe's cookies.[61] This is because the way that Adobe tracks which users have opted out of its cookies is through an attribute embedded in the cookies themselves.[62] As such, a user will be obligated to opt out again if at any time they (a) delete cookies, (b) change

---

[61] ADOBE, *Adobe Experience Cloud Privacy*, https://www.adobe.com/privacy/experience-cloud.html (last visited May 5, 2025).

[62] ADOBE, *Audience Manager Cookies*, https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/audience-manager (last visited May 5, 2025).

browsers, or (c) change devices. And even then, they could not remove the information Adobe captured about them already on its system.

127. A person could theoretically navigate to Adobe itself and press an "opt out" button. But pressing the "opt out" button on the Adobe website is ineffective and may not actually prevent further tracking; Plaintiffs' expert was able to demonstrate that in at least one instance, even after attempting to opt out through this method, the dpm cookie, which should theoretically be altered by the opt out to reflect that the user has opted out of collection by Adobe, continued to show the same value as the original demdex cookie prior to the opt out and the cookies continued to cookie sync. In other words, attempting to opt out through the Adobe website was completely ineffectual in stopping third-party cookie tracking and cookie syncing by Adobe.

128. In addition to requiring a user to remember to opt out again *every single time* they clear their cookies (which consumers often do to avoid the precise type of data collection that opting out is ostensibly supposed prevent) or use a new computer or web browser, assuming that such opting out is even effective (which evidence suggests it is not), Adobe's cookie opt out mechanism does little to address the exceedingly large amounts of data that the demdex cookie can collect in even a short period of time, particularly if it is synched with another third-party cookie.

129. Indeed, the default position of Adobe is that requests to stop collecting data are requests to stop *further* collection of data, and that all data collected up to that point is still retained by Adobe and its corporate clients, and still used for commercial purposes, including targeted advertising.

130. For example, as illustrated in Figure 11, below Audience Manager allows—but does not require—companies using Adobe's technology to include a plug-in on their websites where users of those websites can opt in and out of collection of certain types of information.[63]




131. Worse, as explained above, opting out of data collection in the above example "does not store any **new** user data" and "[o]pts out the user from **further** data collection," but *retains all existing data*[64] This is confusing and misleading to the user. For the user to fully grasp that opting out using the above list does **not** delete data already collected by the website and stored by Adobe,

---

[63] ADOBE, *Audience Manager Plug-in for IAB TCF*, https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/overview/data-privacy/consent-management/aam-iab-plugin (last visited May 5, 2025).
[64] *Id.* (emphasis added).

either (a) Adobe's client would have to voluntarily disclose that information or (b) the user would have to know (1) that the client was an Adobe Experience Platform customer, (2) that Adobe was collecting information about them by virtue of its relationship with this website, and (3) that details on the impact of their opt out would be available on the Adobe website, not in any of Adobe's posted privacy policies but, rather, on a highly technical page entitled "Audience Manager Plug-in for IAB TCF," which is nested in the "Audience Manager" documentation.[65] This is simply not meaningful, appropriate disclosure to consumers about the extent of Adobe's data collection practices and consumers' ability to opt out of that collection.

132. Adobe also theoretically enables users to request the deletion of their data from the Experience Platform, but the ability of users to even make these requests is predicated on the users being aware that Adobe or their client possesses their data, which might be impossible if the user has no relationship whatsoever to Adobe, the site or app using Adobe's technology, or if their data was acquired by Adobe through a third-party data broker.

**ADOBE'S CONDUCT VIOLATES ESTABLISHED DATA PRIVACY REGIMES**

133. The GDPR and CCPA both mirror Fair Information Practice Principles (FIPPs). Two of the core tenants of FIPPs are (1) clear user consent; and (2) data minimization.

134. Adobe does neither of these things. Despite creating a cross-device persistent user identifier, Adobe makes zero effort to ensure Plaintiffs and other Class Members are even aware of where this technology is used. This is clear from its own Privacy Policy, which makes no attempt to identify the entities using its services.

135. Separately, the creation of an ever-present persistent identifier is directly at odds with the idea of data minimization, which requires that data should be stored and used only for the period of time in which that data is necessary. Indeed, the fact that device and user-specific identifiers are persistent (and not deleted) is exactly why even device identifiers like IDFA are being phased out by companies like Apple to preserve users' privacy. Adobe's creation of a

[65] *Id.*

maximized identity profile—linking all existing identifiers together—is a regression from today's privacy norms.

**PLAINTIFFS' AND THE CLASSES DATA HAS VALUE**

136. As of 2023, online advertising was estimated to be a $200 billion industry.

137. Unique identifiers and other PII are extremely valuable to advertisers who use this information to identify and target specific individuals.

138. Indeed, data brokers routinely sell access to this type of information precisely for this reason, and Adobe has agreements with partners to sync this information, in exchange for its own unique identifiers because of their immense value.

139. For instance, datarade.ai currently advertises a Datasys dataset of 10 million hashed emails (using common techniques, including SHA) for $5,000 a month.[66] Another dataset, offered by the company Irys, is specifically advertised as "identity data" containing device IDs, hashed emails, IP address, country code, and timestamps.[67] A similar dataset, offered by Strista, likewise contains hashed email addresses and IP addresses, among other PII, and retails for $9,500 a month or $114,000 a year.[68]

140. The data Adobe intercepts and maintains about Plaintiffs and Class Members is *especially* valuable in light of the other private data accompanied by it, including users' searches and queries through their browsing activity. Companies regularly trade in this type of data, with some companies, like Google and Reklaim, paying consumers to access this data directly.[69]

141. Adobe itself recognizes this value, given its business model is contingent on the monetization of user profiles tied to identifiers. Using this model, Adobe unjustly profited off Plaintiffs' and the Classes' data that it should have never had access to, collected or aggregated.

---

[66] https://datarade.ai/data-products/datastream-group-opt-in-intent-keyword-search-data-usa-datasys

[67] https://datarade.ai/data-products/identity-data-asia-pacific-hashed-emails-with-device-meta-irys

[68] https://datarade.ai/data-products/email-address-data-email-database-us-consumers-564-milli-stirista

[69] https://screenwisepanel.com/; https://www.reklaimyours.com/

**ADOBE'S CONDUCT CAUSES ADDITIONAL HARM & LOSS**

142. In addition to causing privacy harms, Adobe's tracking technology has a measurable impact on Plaintiffs' and the Classes' devices and computing power.

143. Ad blockers are well known to preserve bandwidth, CPU time, data usage, and power consumption by blocking third-party tracking. [70] Adobe's technology, which subverts these privacy protections, depletes these resources.

144. For instance, the entity Brave estimates that, on average, technologies like Adobe's take up an additional 899 KB per webpage in bandwidth.[71]

145. Another study reports that websites with tracking technology incorporated in the background of webpages—like Adobe's—take *nearly twice* as long to load than if such tracking technology was not present on the website.[72] Tracking technologies like Adobe's also result in an additional 15% of power consumption for loading websites, according to a study.[73]

146. Other studies show that when these types of tracking technologies—particularly requests to tracking domains like Adobe's—are disabled, consumers can see a 44% reduction in page load time (e.g., faster loading speeds) and a 39% reduction in device data usage.[74]

147. Thus, if not for Adobe's technology, Plaintiffs and Class Members would see bandwidth, CPU, data usage, and power consumption savings. This is particularly important, as device batteries have only a finite number of charges before they need to be replaced, and most data plans have bandwidth caps after which users will be charged or experience slower load times.[75]

---

[70] https://brave.com/blog/accurately-predicting-ad-blocker-savings/; https://arxiv.org/abs/2002.05666; https://memorial.scholaris.ca/items/3f8c4808-bf66-43b0-b659-3d7a715b1b65;
[71] https://brave.com/blog/accurately-predicting-ad-blocker-savings/;
[72] https://www.websiteoptimization.com/speed/tweak/tracker-performance
[73] https://memorial.scholaris.ca/items/3f8c4808-bf66-43b0-b659-3d7a715b1b65
[74] http://nsl.cs.columbia.edu/papers/2015/trackingprotectionfirefox.w2sp15.pdf
[75] https://www.anker.com/blogs/power-banks/how-do-i-prevent-battery-cycles; https://eudl.eu/pdf/10.4108/icst.mobicase.2014.257770

148. Relatedly, Adobe's use of identifiers—including its ECID—directly occupy space on Plaintiffs' and Class Members' local storage. Adobe did not have permission or authorization to take up any storage on Plaintiffs' and the Classes' devices and browsers. This is yet another, separate harm caused by Adobe's conduct.

**TOLLING & CONCEALMENT**

149. The earliest Plaintiffs and Class Members could have discovered Adobe's conduct was shortly before the filing of this Complaint. Plaintiffs became aware of Adobe conduct through communications with counsel that are protected from disclosure.

150. Plaintiffs and Class Members, despite their due diligence, could not have discovered Adobe's conduct by virtue of how its technology works and its lack of disclosures.

151. Adobe's interception Class Members' private communications with web properties, its assignment and collection of unique identifiers, including ECID, and aggregation of this information along with other personal data and identifiers into detailed identity profiles happens inconspicuously in the background. This process is undetectable to an ordinary person, highly technical, and prevented Plaintiffs and any Class Member from uncovering it.

152. Adobe had exclusive knowledge that ECID, its other identifiers, and its tracking technology were tracking Plaintiffs and Class Members across the internet alongside their private communications on third-party apps, websites, and other services. Similarly, Adobe had exclusive knowledge that it was using this detailed identity information in its DSP, to inform bids serve targeted ads though one of the largest targeted advertising systems.

153. Adobe's fraudulent conduct prevented Plaintiffs and Class Members from discovering its conduct. Adobe maintained a privacy policy that lacked adequate disclosures for Plaintiffs and Class Members to uncover that Adobe even intercepted, had, or used their data. Adobe publicly held out its identifiers and technology as privacy-preserving mechanisms, even though they were not. It also specifically built its technology to circumvent existing known privacy enhancing practices and controls.

154. Adobe was under a duty to disclose the nature and significance of its data interception and use practices—especially in light of its public statements—but did not do so. Adobe is therefore estopped from relying on any statute of limitations by virtue of the discovery rule and doctrine of fraudulent concealment.

## V. CLASS ALLEGATIONS

155. Plaintiffs bring this action under Fed. R. Civ. P. 23 individually and on behalf of the following Classes:

> **Identifier Class:** All natural persons in the United States for whom Adobe assigned, intercepted or stored an ECID, demdex cookie, or other identifying information, or for whom Adobe created an Identity Graph or profile.

> **Communications Class:** All natural persons in the United States who had their communications with third parties intercepted or used by Adobe without their consent.

156. The Classes exclude: (1) any judge presiding over this action or their immediate families; (2) Adobe, its subsidiaries, affiliates, parents, successors, predecessors, and any other entity in which Adobe has a controlling interest; (3) Adobe's current and former employees, officers, and directors; and (4) Plaintiffs' and Adobe's counsel.

157. ***Numerosity.*** While the precise size of the Classes are currently unknown to Plaintiffs, each of the Classes consists of well over a million individuals and members of each of the Classes can be identified through Adobe's records.

158. ***Predominant Common Questions.*** The Classes' claims present several common questions of law and fact that predominant over questions (if any) that affect individual class members. This includes:

(a) Whether Adobe violated Plaintiffs' and the Classes' privacy rights;

(b) Whether Adobe engaged in unfair and deceptive conduct;

(c) Whether Adobe's acts and practices violate the California Invasion of Privacy Act;

(d) Whether Plaintiffs and Class Members are entitled to damages and/or equitable relief, including injunctive relief, restitution, and disgorgement; and

(e) Whether Adobe was unjustly enriched.

159. ***Typicality.*** Plaintiffs' claims are typical of all Class Members because they arise from the same conduct and are based on the same legal theories.

160. ***Adequate Representation.*** Plaintiffs will (and have) fairly and adequately represented the Classes and protected the interest of all Class Members. Plaintiffs have retained competent counsel with significant experience in class action and data privacy litigation. Plaintiffs and counsel have no interest that conflicts with the interests of the Classes and is not subject to any unique defenses. Plaintiffs and their counsel will vigorously prosecute this action to advance the interest of the Classes and have the resources necessary to do so.

161. ***Substantial Benefits.*** A class action is superior to all other possible methods to fairly and efficiently adjudicate this case and controversy, and joinder of all Class Members is impracticable. Proceeding as a class case has significant advantages to individual litigation, including: (1) comprehensive oversight by a single court, which avoids inconsistent outcomes; and (2) saving time and expense by litigating the same claims arising from the same conduct all in one action.

162. Plaintiffs reserve all rights to revise or modify the class allegations based on facts and legal developments following additional investigation or discovery.

## CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS

163. California law applies to every Class Member's claims. Adobe maintains its principal place of business in California and conducts substantial business in California, including the activities giving rise to Plaintiffs' and Class Members' claims. Adobe's decision to reside in California and avail itself of California's laws makes the application of California law to its conduct alleged herein constitutionally permissible. Adobe also elects to apply California law in its Terms of Use and Privacy Policy.

164. For example, Adobe's corporate officers responsible for decision making including its Chief Compliance Officer and President of its Digital Experience Business, as well as many of its software engineers are based in California. This includes Adobe's Senior Vice President of the

Adobe Experience Cloud, who "spearheaded the product strategy and engineering for Adobe Experience Platform."[76] Accordingly, the decisions to create, market, and deploy Adobe's tracking technology on its corporate customers' websites occurred in California.

165. Adobe's technology can be found on several websites and mobile applications controlled by California entities, including LinkedIn, Wells Fargo, Gap, Intuit, and Intel.

166. Adobe also shares Plaintiffs' and Class Members' demdex cookie IDs and other unique identifiers with California data broker, analytics, and advertising companies including, Google, the Trade Desk, and LiveRamp.

167. And, of course, Adobe itself is headquartered in California, where it processed, compiled, and made use of Plaintiffs' and the Classes' data.

168. Accordingly, under California's choice of law rules, the application of California law is appropriate because California has significant contacts to the claims and Parties in this action, California has a greater interest in applying its laws, given Adobe's residency in the State and the location of the conduct at issue, over any other state.

## VI. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Violation of Common Law Invasion of Privacy (Intrusion Upon Seclusion)
### On Behalf of the Plaintiffs and Classes

169. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

170. Intrusion upon seclusion requires pleading: (1) that the defendant intruded on a place, conversation, or matter in which Plaintiffs have a reasonable expectation of privacy; and (2) that the intrusion would be highly offensive to a reasonable person.

171. Adobe's collection, interception, and use of Plaintiffs' and Class Members' personally identifiable information constitutes an intentional intrusion. As does its use of this

[76] https://business.adobe.com/summit/adobe-summit.html

information to create "identity graphs," the latter of which is based off these identifiers to track and profile Plaintiffs and Class Members based on their online activity.

172. Adobe's interception and use of Plaintiffs' and Class Members' private online communications, associated with their assigned ECID and other identifying information, is likewise an intentional intrusion upon Plaintiffs' and Class Members' solitude.

173. Plaintiffs and Class Members reasonably expected their unique identifiers and other personal data, alongside their online activity, would not be intercepted or used by an unknown third-party. The types of identifying information Adobe stored in "identity graphs" are particularly private because they are often directly identifiable, permanent identifiers (e.g., IP address, phone number, email). Plaintiffs and Class Members reasonably expected this information would remain private and confidential and would not be intercepted or used by third parties without their consent.

174. This expectation is particularly heightened given that there were no disclosures of Adobe's involvement in intercepting, processing, and using their unique identifiers and other personal data and online communications.

175. Plaintiffs and Class Members did not consent to, authorize, or understand Adobe's interception or use of their private data.

176. Adobe's conduct is highly offensive because it violates established social norms. Consumers do not expect to be surveilled whenever they use the internet, especially in light of state laws requiring companies to make adequate disclosures regarding their collection and use of data.

177. Adobe's conduct is particularly offensive in light of the secretive nature in which it takes place. Plaintiffs and Class Members had no way of knowing Adobe collected their unique identifiers and other personal data and other online communications, and Adobe did so from thousands of websites, if not more.

178. Adobe's conduct caused Plaintiffs and Class Members harm and injury, including a violation of their privacy interests.

179. Plaintiffs and Class Members seek damages to compensate the harm to their privacy interests, among other damages, as well as disgorgement of profits made by Adobe as a result of its intrusion upon seclusion.

180. Defendant's conduct was willful, knowing, and carried out with a conscious disregard for Plaintiffs' or Class Members' rights, Plaintiffs' and Class Members are entitled to punitive and exemplary damages.

181. Plaintiffs and Class Members also seek any other relief the Court may deem just and proper.

**SECOND CAUSE OF ACTION**
**Violation of Article I, Section 1 of the California Constitution (Invasion of Privacy)**
**On Behalf of the Plaintiffs and Classes**

182. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

183. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

184. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

185. The right to privacy in California's Constitution creates a right of action against private and government entities.

186. Plaintiffs and Class Members have and continue to have a reasonable expectation of privacy in their personal information, identities, and private data, pursuant to Article I, Section I of the California Constitution.

187. The identifiable and private information Adobe intercepted, stored, and used without Plaintiffs' and Class Members' consent was used to track them consistently, and

persistently, across internet-connected services and to serve targeted advertisements. The manner in which Adobe intercepted this information defeated established privacy-mechanisms and social norms.

188. This conduct constitutes an extremely serious invasion of privacy that would be highly offensive to a reasonable person. Reasonable individuals do not expect that there is an entity intercepting and monitoring all of their online activity, let alone using it for profit.

189. Adobe's conduct violated the privacy of hundreds of thousands (if not millions) of Class Members, including Plaintiffs. Adobe did not have consent to intercept this information, let alone use it.

190. Plaintiffs and Class Members seek damages to compensate the harm to their privacy interests, among other damages, as well as disgorgement of profits made by Adobe as a result of its intrusion upon seclusion.

191. Defendant's conduct was willful, knowing, and carried out with a conscious disregard for Plaintiffs' or Class Members' rights, Plaintiffs and Class Members are entitled to punitive and exemplary damages.

192. Plaintiffs and Class Members also seek any other relief the Court may deem just and proper.

**THIRD CAUSE OF ACTION**
**Violation of the California Invasion of Privacy Act ("CIPA")**
**Cal. Penal Code § 631**
**On Behalf of the Plaintiffs and Classes**

193. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

194. CIPA § 631 prohibits any person who by means of any "machine, instrument, contrivance" or in "any other manner:" (1) intentionally taps or makes an unauthorized connection with "any telegraph or telephone wire, line, cable, or instrument;" (2) willfully and without consent of "all parties to the communication" or in "any unauthorized manner" reads or "attempts to read" or "learns the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place

within" California; (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way" information so obtained; or (4) from aiding, agreeing, employing, or conspiring with "any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

195. Adobe is a person under CIPA § 631.

196. Adobe maintains its principal place of business in California, which is where it designed, created, conspired, and effectuated the interception and use of Plaintiffs' and Class Members' unique identifiers and other personal data and private communications.

197. Adobe's technology (e.g., the Adobe Data Collection Tag, Adobe Experience Cloud ID (ECID) framework, etc.), and Plaintiffs' and Class Members' computers, mobile devices, and connected TVs, are a "machine, instrument, contrivance, or . . . other manner" under CIPA § 631.

198. At all relevant times, Adobe used its technology to make unauthorized connections with the lines of communication and instruments used by Plaintiffs and Class Members to access online services without the consent of all parties to those communications.

199. Adobe willfully, and without consent, read or attempted to read, or learn the contents and meaning of, Plaintiffs' and Class Members' communications with online services while those communications were in transmit or passing over a wire, line, or cable, or were being sent or received within California through its tracking technology, as described herein. This interception happens prior to or at the same time they would be received by the intended recipient.

200. Adobe used, and attempted to use, these identifiable, private communications for its own benefit, including targeted advertising as described herein.

201. Adobe also aided, agreed with, employed, and conspired with website operators and advertising entities to intercept and use this data for profit.

202. The interception and use of Plaintiffs' and Class Members' communications was without authorization or consent from Plaintiffs and Class Members.

203. Plaintiffs and Class Members have been harmed as a result of Adobe's conduct. Their private data has been intercepted, viewed, and used for targeted advertising and has not been destroyed. Plaintiffs and Class Members face an imminent threat of continued injury, as this data continues to be stored and used, such that Plaintiffs and Class Members have no adequate remedy at law.

204. Plaintiffs and Class Members seek statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

**FOURTH CAUSE OF ACTION**
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 632**
**On Behalf of the Plaintiffs and Classes**

205. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

206. Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication[.]"

207. Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

208. Plaintiffs' and Class Members' communications with online services are confidential communications for purposes of § 632 because Plaintiffs and Class Members had an objectively reasonable expectation of privacy in this data.

209. Plaintiffs and Class Members expected their communications would not be shared with Adobe, as there were no disclosures that Adobe would secretly eavesdrop upon or record their information and communications.

210. Adobe's tracking technology is an electronic amplifying or recording devices for purposes of § 632.

211. By contemporaneously eavesdropping on or recording Plaintiffs' and Class Members' confidential and identifiable communications to online services through this technology, Adobe violated § 632 of CIPA.

212. At no time did Plaintiffs or Class Members consent to Adobe's conduct, nor could they reasonably expect that their communications with online services would be overheard and recorded by Adobe.

213. Adobe utilizes these private communications for their own benefit, including to serve targeted advertisements and develop user profiles.

214. Plaintiffs and Class Members have been harmed as a result of Adobe's conduct. Their private data has been intercepted, viewed, and used for targeted advertising and has not been destroyed. Plaintiffs and Class Members face an imminent threat of continued injury, as this data continues to be stored and used, such that Plaintiffs and Class Members have no adequate remedy at law.

215. Plaintiffs and Class Members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

## FIFTH CAUSE OF ACTION
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 638.50 & 638.51**
**On Behalf of the Plaintiffs and Classes**

216. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

217. CIPA § 638.50(b) defines a "pen register" as a "device or process" that "records or decodes dialing, routing, addressing, or signaling information" that is "transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

218. Separately, CIPA § 638.50(c) defines a "[t]rap and trace device" as a "device or process that captures the incoming electronic or other impulses that identify the originating number

or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."

219. CIPA § 638.51 prohibits a person from installing either a pen register or trap and trace device without a court order.

220. Adobe is a person under CIPA § 638.51.

221. Adobe implemented and installed the ECID framework—which are pen registers and/or trap and trace devices—on Plaintiffs' and Class Members' devices and browsers.

222. These processes captured "routing, addressing, or signaling information" because they intercept: (1) unique user and device identifiers; and (2) the Adobe Org ID (indicating the website to whom the user is communicating).

223. Adobe was not authorized by any court order to use a pen register or trap and trace device to record or capture Plaintiffs' and Class Members' routing, addressing, or signaling information.

224. Plaintiffs and Class Members did not consent to Adobe's installation of a pen register or trap and trace device on their devices and browsers.

225. Plaintiffs and Class Members have been harmed as a result of Adobe's conduct. Adobe did not have authorization to use pen registers and/or trap and trace devices to surveille and identify Plaintiffs and Class Members or other routing, addressing, and signaling information revealing who the intended recipients of their communications were.

226. Plaintiffs and Class Members face an imminent threat of continued injury, as this data continues to be stored and used, such that Plaintiffs and Class Members have no adequate remedy at law.

227. Plaintiffs and Class Members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

**<u>SIXTH CAUSE OF ACTION</u>**
**Violation of the Comprehensive Computer Data Access and Fraud Act**
**Cal. Penal Code § 502 ("CDAFA")**
**On Behalf of the Plaintiffs and Classes**

228. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

229. The California Legislature enacted CDAFA to "expand the degree of protection afforded. . . from tampering, interference, damage, and unauthorized access to ([including the extraction of data from)] lawfully created computer data and computer systems," finding and declaring that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . forms of unauthorized access to computers, computer systems, and computer data," and that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals . . ." Cal. Penal Code § 502(a).

230. Plaintiffs' and Class Members' devices on which Adobe's tracking technology is installed, including their computers, smart phones, and tablets, constitute "Computer system" within the meaning of the CDAFA. *Id*. § 502(b)(5).

231. The data that Adobe accessed and collected from Plaintiffs' and Class Members' devices constitute "Data" within the meaning of the CDAFA. *Id*. § 502(b)(8).

232. Defendant Adobe violated § 502(c)(1) of the CDAFA by knowingly accessing without permission Plaintiffs' and Class Members' devices, and placing cookies and other identifiers on their devices and local storage, in order to wrongfully obtain and use their personal data in violation of users' reasonable expectations of privacy in their devices and data.

233. Defendant Adobe violated § 502(c)(2) of the CDAFA by knowingly and without permission taking, copying, and making use of Plaintiffs' and the Class Members' unique identifiers and other personal data from their devices.

234. Plaintiffs' and the Class Members' device functionalities, device systems, device network, and browsers constitute "computer services" within the meaning of the CDAFA. Defendant Adobe violated § 502(c)(3) by knowingly and without permission using and accessing

those computer services, and/or causing them to be used and accessed through Adobe's tracking technology and identifying mechanisms incorporated on third party websites and apps.

235. Plaintiffs and the Class Members' devices, device systems, device network, and browsers constitute "computer, computer system, or computer network" within the meaning of the CDAFA. Defendant Adobe violated § 502(c)(7) by knowingly and without permission accessing those devices, device systems, device networks, and browsers, and/or causing them to be accessed through Adobe's tracking technology and identifying mechanisms incorporated on third party websites and apps.

236. Defendant Adobe violated §§ 502(c)(6) and (c)(13) of the CDAFA by knowingly, and without permission from Plaintiffs and the Class Members, providing and/or assisting in providing advertisers and website owners the ability to access Plaintiffs' and the Class Members' devices, device systems, device networks, and browsers via its Tracking Technology and identifying mechanisms incorporated on third party websites and apps.

237. Under § 502(b)(12) of the CDAFA a "Computer contaminant" is defined as "any set of computer instructions that are designed to . . . record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information." Adobe's tracking technology and identifying mechanisms constitutes computer contaminants as defined by § 502(b)(12) of the CDAFA. Defendants Adobe violated § 502(c)(8) by knowingly and without permission introducing computer contaminants, including first-party cookies, via its tracking technology incorporated on Plaintiffs' and the Class Members' devices, device systems, device networks, and browsers, which intercepted their personal data to Adobe. As described *supra*, Adobe's tracking technology is deeply hidden; Plaintiffs and Class Members had no way to remove it or opt out of its functionality.

238. Plaintiffs and Class Members suffered damage and loss as a result of Adobe's conduct. Adobe's practices have deprived Plaintiffs and the Class Members of control over their valuable property (namely, their sensitive personal data), the ability to receive compensation for that data, and the ability to withhold their data for sale. Plaintiffs and Class Members suffered

harm because Adobe unjustly profited from the PII and private data Adobe intercepted by using it for its own business purposes, like its Real-Time CDP. Adobe's tracking technology has caused harm to Plaintiffs and Class Members by taking up additional bandwidth, CPU time, data usage, and power consumption in their devices. Adobe's practices have also violated Plaintiffs' and Class Members' private interests by collecting and disclosing their PII and other private information.

239. Plaintiffs and the Class Members seek compensatory damages in accordance with CDAFA § 502(e)(1), in an amount to be proven at trial, and injunctive or other equitable relief.

240. Plaintiffs and Class Members have also suffered irreparable and incalculable harm and injuries from Adobe's violations. The harm will continue unless Adobe is enjoined from further violations of this section. Plaintiffs and Class Members have no adequate remedy at law.

241. Plaintiffs and the Class Members are entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because Adobe's violations were willful and, upon information and belief, Adobe is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294. Plaintiffs and the Class Members are also entitled to recover their reasonable attorneys' fees under § 502(e)(2).

## SEVENTH CAUSE OF ACTION
**Violations of the California Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code §§ 17200 *et. seq.***
**(On Behalf of Plaintiffs and the Class)**

242. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

243. The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof. Code § 17200.

244. Adobe is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

245. Adobe violated the UCL by engaging in unlawful and unfair business acts and practices.

246. Adobe's "unlawful" acts and practices include its violation of the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.*; the CDAFA, Cal. Penal Code § 502, and the common law right of privacy.

247. Adobe's conduct violated the spirit and letter of these laws, which protect property and privacy interests and prohibit the unauthorized collection of private communications and personal information.

248. Adobe's "unfair" acts and practices include its surreptitious collection of private communications and personal information, including Plaintiffs' and Class Members unique identifiers without consent.

249. Plaintiffs and Class Members were completely unaware of Adobe's conduct and could not have anticipated Adobe's intrusion into their privacy through its unlawful and unfair collection of their personal information and private communications. Accordingly, Plaintiffs and Class Members could not avoid the harm Adobe caused.

250. Adobe's conduct was immoral, unethical, oppressive, unscrupulous and substantially injurious to Plaintiffs and Class Members. Further, the gravity of the harm of Adobe's secret interception of Plaintiffs' and Class Members' personal information and private communications is significant, and there is no corresponding benefit resulting from such conduct.

251. Plaintiffs and Class Members have suffered injury, including the loss of money and/or property as a result of Adobe's unfair and unlawful practice of intercepting Plaintiffs' and Class Members' personal information and private communications, which has economic value.

252. Plaintiffs and Class Members have suffered harm in the form of diminution in the value of their personal information and private communications.

253. Adobe caused damage to and loss of Plaintiffs' and Class Members' property right to control the dissemination and use of their personal information and private communications.

254. Adobe has reaped unjust profits and revenues in violation of the UCL as a result of its unlawful and unfair conduct, including profits and revenues from its use of Plaintiffs' and Class Members' data in its targeted advertising and other services. Plaintiffs and Class Members seek restitution and disgorgement of these unjust profits and revenues.

255. Plaintiffs and Class Members seek all monetary and non-monetary relief allowed under the statute and equity, including restitution; declaratory relief; reasonable attorneys' fees

and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief permissible under the UCL.

**EIGHTH CAUSE OF ACTION**
**Unjust Enrichment**
**On Behalf of the Plaintiffs and Classes**

256. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

257. Adobe receives benefits from Plaintiffs and Class Members in the form of their unique identifiers and other personal data and private online communications. Adobe acquired this information without Plaintiffs' and Class Members' authorization and without providing corresponding compensation.

258. Adobe acquired and used this private data for its own benefit, including tangible economic benefits from companies that used Adobe for targeted advertising.

259. Had Plaintiffs and Class Members known of Adobe's misconduct, they would not have agreed Adobe could acquire and use their private data.

260. Adobe unjustly retained these benefits at the expense of Plaintiffs and Class Members. Plaintiffs and Class Members were harmed by this conduct and were not provided any commensurate compensation.

261. The benefits Adobe received and derived from Plaintiffs' and Class Members' private data rightly belong to Plaintiffs and Class Members. It is inequitable under unjust enrichment principles for Adobe to retain the profits and other intangible benefits they derived through its wrongful conduct.

262. Adobe should be compelled to disgorge these profits and other inequitable proceeds in a common fund for the benefit of Plaintiffs and Class Members.

**NINTH CAUSE OF ACTION**
**Injunctive Relief**
**On Behalf of the Plaintiffs and Classes**

263. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

264. Adobe's conduct has and continues to cause harm to Plaintiffs and Class Members' privacy and autonomy, as it continues to store unique persistent identifiers, as well as the private contents of their communications, on its own systems. Adobe routinely uses this information for targeted advertising.

265. Accordingly, Plaintiffs and Class Members seek injunctive relief, including an order permanently restraining Adobe from continuing to use and store this information without consent and/or a court order, and requiring Adobe to delete this information from its systems.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court enter an Order:

a. Certifying the Classes and appointing Plaintiffs as Class Representative;

b. Finding Adobe's conduct unlawful;

c. Awarding injunctive and other equitable relief as is just and proper;

d. Awarding Plaintiffs and the Classes statutory, actual, compensatory, nominal, and other damages, as well as restitution and/or disgorgement of unjust and unlawful profits;

e. Awarding punitive damages under California Civil Code § 3294 by unlawfully tracking Plaintiffs' web and app use and collecting their PII without consent with a conscious disregard for their rights per Section 3294(c)(1) with malic and fraudulent intent;

f. Awarding pre-judgment and post-judgment interest;

g. Awarding reasonable attorneys' fees, costs, and expenses; and

h. Granting any other relied as the Court sees just and proper.

## IX. JURY TRIAL DEMAND

The Plaintiffs demand a trial by jury of all issues so triable.

Dated: October 22, 2025

/s/ Gary M. Klinger
Gary M. Klinger (admitted pro hac vice)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
gklinger@milberg.com

Christian Levis (admitted pro hac vice)
Amanda Fiorilla (admitted pro hac vice)
Rachel Kesten (admitted pro hac vice)
Yuanchen Lu (admitted pro hac vice)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com
rkesten@lowey.com
ylu@lowey.com

Daniel R. Schwartz (admitted pro hac vice)
Rebecca Trickey (admitted pro hac vice)
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: (312) 214-7900
dschwartz@dicellolevitt.com
rtrickey@dicellolevitt.com

David A. Straite (pro hac vice pending)
**DICELLO LEVITT LLP**
485 Lexington Ave., Tenth Floor
New York, New York 10017
Telephone: (646) 933-1000
dstraite@dicellolevitt.com

*Interim Co-Lead Counsel*